**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**STEFAN GOIA,**

                        **Plaintiff,**

     **v.**

**CITIFINANCIAL AUTO,**

                       **Defendant.**

**1:10-cv-2405-WSD**

---

**OPINION AND ORDER**

This matter is before the Court on CitiFinancial Auto Corporation's ("CitiFinancial" or "Defendant") Motion for Summary Judgment [37] and Stefan Goia's ("Goia" or "Plaintiff") Motion for Summary Judgment [43].

**I.    BACKGROUND**

Although Plaintiff is proceeding *pro se*, he still is required to comply with the Federal Rules of Civil Procedure and the Local Rules of this Court.  Because Plaintiff did not file a response to Defendant's Motion for Summary Judgment, Defendant's Statement of Undisputed Material Facts are deemed admitted pursuant to the Local Rules.[1]  LR 56.1 NDGa.

---

[1] The Local Rules for the Northern District of Georgia state that "[a] respondent to a summary judgment motion shall include . . . with the responsive brief: [a]

The Court further notes that although Plaintiff claims to rely on "my Statement of Undisputed Material Facts" in support of his Motion for Summary Judgment, no such pleading exists in the record. (Pl.'s Mot. for Summary J. at 2). Plaintiff did include a "Summary of Undisputed Material Facts" in his Motion for Summary Judgment. This summary does not comply with the Local Rules of this Court. LR 56.1 B.(1) NDGa. The Court declines to liberally construe the rambling, unnumbered narrative summary in the body of Plaintiff's Motion as a properly submitted, separate statement of undisputed material facts that complies with the Local Rules.[2] Thus, the Court relies upon Defendant's Statement of Undisputed Material Facts, deemed admitted by Plaintiff, and the exhibits and affidavits that the parties attached to their motions for summary judgment, in considering the parties' requests for summary judgment.

A.  The 2007 Suzuki Aerio Retail Installment Sales Contract

On May 25, 2007, Plaintiff and his wife bought a 2007 Suzuki Aerio (the "Vehicle") from Star Suzuki Mall of Georgia ("Star Suzuki"). They purchased the

---

response to the movant's statement of undisputed facts." LR 56.1 B.(2)a. NDGa. A party's failure to provide a response to the movant's statement of undisputed facts results in the movant's facts being deemed as admitted. LR 56.1 B.(2)a.(2) NDGa.

[2] Although the Court construes *pro se* complaints liberally, they must also comply with the procedural rules that govern pleadings. See McNeil v. United States, 508 U.S. 106, 113 (1993).

car by executing a Retail Installment Sales Contract Single Finance Charge agreement (the "Contract") with Star Suzuki which, besides being a contract for sale of the Vehicle, also provided terms by which Plaintiff and his wife financed the purchase. (Def.'s Statement of Undisputed Material Facts ("DSUMF") ¶ 1; Ex. B to Aff. of Stefan Goia). The Contract provided the terms for the financing agreement with Plaintiff and his wife. Plaintiff and his wife agreed "to pay the Creditor - Seller . . . the Amount Financed and Finance Charge" according to the terms set forth in the Contract. (Ex. B to Aff. of Stefan Goia).

In the Contract, Plaintiff and his wife granted to Star Suzuki a security interest in the Vehicle. (Id.). To protect Star Suzuki's security interest, Plaintiff and his wife agreed to obtain insurance on the Vehicle.[3] (Id.). They specifically agreed "to have physical damage insurance covering the loss of or damage to the vehicle for the term of [the] contract." (Id.). The Contract stated further:

> The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge

---

[3] The Court notes that Plaintiff's wife, Florica Goia, signed a "Confirmation of Accidental Physical Damage Insurance" that required her to take certain actions regarding the insurance on the Vehicle. (Ex. 11 to Pl.'s Dep.). There is no similar form in the record that was signed by Plaintiff.

you must pay.  The charge will be the premium of the insurance and a finance charge at the highest rate the law permits.

(Id.).[4]

Plaintiff would be considered in default if he violated any term in the

Contract.  (Id.).  In the event of default, Defendant could demand that Plaintiff pay

the total amount of indebtedness due under the Contract and could peacefully

---

[4] The Contract provided for the election of Vendor's Single Interest ("VSI") insurance for the term of the Contract to protect the creditor from loss or damage (including by collision) to the Vehicle during the term of the financing.  (Ex. B to Aff. of Stefan Goia).  Plaintiff was not required to obtain this insurance.  (Id.). Plaintiff did purchase a "GAP protection" plan for the Vehicle as part of the Contract for $600.  (Id.).  Neither party has provided a copy of the GAP policy.  In Massih v. Jim Moran & Assocs., Inc., a Guaranteed Auto Protection ("GAP") policy was described as:

> The GAP policy is designed to pay off the balance of Plaintiff's loan, if any remained after payment of the primary physical damage insurance, if the vehicle became a constructive total loss while the loan was still in force.  The GAP policy applies primarily to situations in which a purchaser's car is damaged and deemed a total loss, and an independent third party casualty insurance company's payment on this total loss is less than the amount owed under the [Contract].  This "gap" results in the purchaser owing money under the [contract], without the benefit of still having the use of the totaled car.  Under the [GAP policy], the dealer would waive any amount the purchaser is left owing on the [contract] after application of all the casualty insurance monies, in effect forgiving this balance on the amount financed.

542 F. Supp. 2d 1324, 1327 (M.D. Ga. 2008).  This description of a GAP policy is consistent with the oral explanation of the GAP policy allegedly given to Plaintiff by Star Suzuki when it sold him the Vehicle and GAP policy.  (Pl.'s Dep. 96:6-23).

repossess the Vehicle as the law allows.  (Id.).  If the Vehicle was damaged, destroyed, or missing, Plaintiff agreed to pay Defendant the total amount of indebtedness owed under the Contract.  (Id.).

The Contract constituted "the entire agreement between [Plaintiff] and [Defendant] . . . ."  (Id.).  All changes to the Contract were required to be in writing; and oral changes were not binding.  (Id.).

By executing a block at the bottom of the Contract, Star Suzuki assigned "its interest in [the] contract" to CitiFinancial pursuant to "the terms of [Star Suzuki's] agreement(s) with [CitiFinancial]."  (Id.).

Plaintiff admits that he signed the Contract and understood and agreed to its terms.  (DSUMF ¶ 10).  Plaintiff specifically understood that he was required to maintain adequate physical damage insurance on the Vehicle pursuant to the Contract.  (Id.  ¶ 11).  The parties do not dispute that the Contract was assigned to CitiFinancial and that CitiFinancial is authorized to enforce its terms.[5]

B.    The Nationwide Insurance Company policy

On June 11, 2007, a little over two weeks after Plaintiff and his wife bought the Vehicle, Plaintiff obtained an insurance policy covering the Vehicle from

_____

[5] The assignment to CitiFinancial is part of the Contract and the copy of the Contract filed by Plaintiff and referred to in his affidavit discloses the assignment to CitiFinancial.

Nationwide Insurance Company ("Nationwide"). (Ex. D to Aff. of Stefan Goia). This policy insured the Vehicle for physical damage in an amount equal to the actual cash value of the Vehicle, less $500. (Id.). The policy identified Star Suzuki as the lienholder. (Id.). In June 2007, Defendant received notification that Plaintiff had obtained a physical damage insurance policy from Nationwide. (DSUMF ¶ 14). Plaintiff claims that he provided copies of the insurance policy to Defendant and Star Suzuki after it was issued. (Dep. of Pl. 44:12-50:9).

The Contract provides that "[i]f the vehicle is lost or damaged," any insurance settlement could be used to reduce what Plaintiff and his wife owed under the Contract, or to repair the Vehicle.

C. The loss of the Vehicle and Star Suzuki

On June 17, 2007, about a week after the insurance was procured, Plaintiff claims that the Vehicle was wrecked in an accident "somewhere in Ohio" and that it has remained in Nationwide's custody in Ohio since the accident. (Aff. of Stefan Goia at 5). Plaintiff claims that on June 18, 2007, he asked Star Suzuki, together with Nationwide, to arrange for payment for the car pursuant to the Nationwide physical damage insurance and GAP policy purchased from Star Suzuki. (Id.). Plaintiff claims these coverages were more than sufficient to cover Defendant's interest in the Vehicle. (Id. at 5-6). Plaintiff claims Star Suzuki asserted that its

obligation under the GAP policy was limited to $3,500.  (Id.).  Plaintiff claims

further that Star Suzuki did not provide any payments under the GAP policy and

attempted to sell to Plaintiff a new 2007 Suzuki Aerio, offering to apply the $3,500

GAP policy payment to the purchase of a new vehicle.  (Id.).

Plaintiff claims that after he refused to purchase a new car and after asking

Star Suzuki to work with Nationwide to pay off the loan with proceeds from

Plaintiff's coverage with Nationwide and under the GAP policy, Plaintiff was

treated rudely and told to leave the Star Suzuki offices.  (Id. at 6).

Defendant claims it did not learn that the Vehicle was allegedly damaged in

a car accident and left in Ohio until Plaintiff's deposition on December 21, 2010.

(DSUMF ¶ 33).[6]

D.     The Collateral Protection Insurance Policy and breach of contract

In October 2007, Defendant was notified by Balboa Insurance Company

("Balboa"), a third-party vendor that monitors the status of collateral that secures

Defendant's loans, that Plaintiff's physical damage insurance policy with

Nationwide had been cancelled effective September 7, 2007.  (DSUMF ¶ 15).

---

[6] Plaintiff claims that his son informed the tow truck driver who was dispatched to
his home by Defendant to repossess the Vehicle, that the Vehicle was in Ohio.
(Pl.'s Dep. 100:2-101:1).

On October 14, 2007, Defendant wrote a letter to Plaintiff entitled "Insurance Request," notifying Plaintiff that Defendant's records reflected that his physical damage insurance policy had expired. (Id. ¶ 16). In the letter, Plaintiff was advised that the Contract required him to maintain insurance on the car, advised him that the physical damage insurance policy was required to name Defendant as loss payee under the policy,[7] and requested that Plaintiff contact Defendant to provide proof of the required insurance. (Id.). The Insurance Request informed Plaintiff that if he failed to provide proof of the required insurance within fifteen days, Defendant may purchase a policy to insure its collateral. (Id.). Plaintiff was advised that the premium for the coverage would be $3,681 and that it would be collected from Plaintiff by billing him for it pursuant to the Contract. (Id.).

According to Defendant's records, Plaintiff did not respond to the Insurance Request within fifteen days. (Id. ¶ 17). Plaintiff admits that he received the Insurance Request. (Aff. of Stefan Goia at 7). Plaintiff also claims that he, at some point, "answered that [his] insurance [had] not expired, and that in fact [he had] 2 insurances, a full coverage insurance with Nationwide and GAP insurance signed with Star Suzuki paid by [him] and listed on the loan contract . . . ." (Id.).

---

[7] The Contract does not contain a requirement that Defendant be named as the loss payee under any physical insurance policy. (Ex. B to Aff. of Stefan Goia).

In support of his claim that his insurance had not expired, Plaintiff refers to copies of his insurance policies and an email from "HATHAWS1@nationwide.com" that he claims prove that he had continuous insurance coverage from June 5, 2007, until July 5, 2010, when it was cancelled. (Id. at 18, 21; Ex. G to Aff. of Stefan Goia; Annex 2 to Pl.'s Mot. to Remove Clerk's Entry of Default).

On November 12, 2007, Defendant sent a second letter to Plaintiff entitled "Notice of Placement of Insurance." (DSUMF ¶ 18). This letter notified Plaintiff that because Plaintiff had not provided proof of insurance on the Vehicle, Defendant was placing a collateral protection insurance policy (the "CPI Policy") covering a period of thirty-six months on the Vehicle. (Id.). The letter gave Plaintiff an additional fifteen days to provide proof of insurance, and stated that if proof was not received, the CPI Policy would be purchased and Plaintiff would be billed $3,681 through a prorated increase in his monthly payments. (Id.). The letter also advised Plaintiff that if he obtained adequate physical damage insurance anytime in the thirty days following the letter and provided proof that a policy was in force, then the CPI Policy would be cancelled without charging any costs, interest, or other amounts to him. (Id.).

Plaintiff did not respond to the Notice of Placement Insurance, and in December 2007, Defendant purchased a CPI Policy from Balboa, adding the

premium amount to the unpaid balance on the loan.  (Id. ¶¶ 19-20).  Adding the premium amount to Plaintiff's balance increased Plaintiff's monthly payment by $115.03, from $449.63 to $564.66.  (Id. ¶ 21).

Plaintiff claims that after the CPI Policy payment appeared on his January 2008 loan statement and bill, he attempted to once again advise Defendant that he obtained and had in place adequate insurance on the Vehicle and that he was improperly charged for the CPI Policy.  (Aff. of Stefan Goia at 8).  Plaintiff claims that Defendant referred him to Balboa, although he had told Defendant that he had nothing to do with Balboa, that Defendant needed to solve any problems with Balboa, and requested that Defendant "[leave him] alone and not retain any more amounts out of the principal."  (Id. at 8-9).  Plaintiff refused to communicate with Balboa or provide it with any of his insurance information.  (DSUMF ¶ 27).

Plaintiff continued to make payments under the Contract to Defendant in the amount required by the Contract, excluding any billed payments for coverage under the CPI Policy.  (Aff. of Stefan Goia at 8-9, 20; Annex 2 to Pl.'s Mot. to Remove Clerk's Entry of Default).  Plaintiff admits that he ceased rendering any amounts to Defendant after court action began in April 2010.  (Id.).

E.     The continuing dispute over the CPI Policy

After the January 2008 loan statement was sent to Plaintiff, the relationship between the parties deteriorated.  (Aff. of Stefan Goia at 9).  Defendant's records reflect that, in January 2008, it began placing collection calls to Plaintiff in an effort to resolve the dispute over the CPI Policy, and to help Plaintiff with the alleged default on the loan.  (DSUMF ¶ 24).

Plaintiff became increasingly angry and hostile upon receiving these debt collection calls.  (Id. ¶ 26).  Plaintiff eventually asked Defendant to cease calling him and he refused to communicate with Defendant or Balboa about the CPI Policy or the Vehicle.  (Id.; Aff. of Stefan Goia at 22).  Plaintiff claims that instead of ceasing the calls, Defendant "continued to call more often; even more calls in a day, reaching even 7 calls a day; and even after 9:00 [p.m.]."  (Aff. of Stefan Goia at 22).  Plaintiff claims that a CitiFinancial employee told him that "we will continue to call until you pay" and that Defendant also called his references and his wife's workplace regarding the debt.  (Pl.'s Dep. 86:12-13, 92:7-94:10).  Plaintiff claims that as a result of the debt collection calls he became ill as a result of stress on his heart.  (Aff. of Stefan Goia at 22).

After communications with Plaintiff failed to resolve the issue, Defendant, in 2009, unsuccessfully attempted to peaceably repossess the Vehicle.  (DSUMF ¶ 28).

In April 2010, Defendant filed a replevin action in the State Court of Gwinnett County, Georgia, (the "Replevin Action") to obtain a writ of possession for the Vehicle.  (Id. ¶ 29).  On September 1, 2010, following a bench trial, a writ of possession was issued requiring Plaintiff to turn the Vehicle over to Defendant.  (Id. ¶ 30).  When Defendant learned that Plaintiff could not comply with the writ of possession because the Vehicle had been abandoned in Ohio following an accident, Defendant dismissed the Replevin Action without prejudice.  (Id. ¶ 34).

On June 9, 2010, while the Replevin Action was pending, Plaintiff filed this action against Defendant in the State Court of Fulton County.  Plaintiff's *pro se*, two-page, single-spaced Complaint states that he is suing Defendant for "discrimination, breach of contract, theft, continuous harassment for over 27 months, defamation and trespassing."  (Compl. at 1).

Plaintiff claims that Defendant's addition of the CPI Policy to the loan constitutes a breach of contract because the Contract only allowed Defendant to purchase additional insurance on his behalf if he did not have insurance sufficient to cover Defendant's interest.  (Compl. at 1; Ex. B to Aff. of Stefan Goia).

Plaintiff specifically asserts that he had two valid insurance policies — the Nationwide and GAP policies — that complied with the Contract, that neither had lapsed, and that he informed Defendant of the existence of these policies in response to the Insurance Request. (Compl. at 1; Aff. of Stefan Goia at 7-8).

Plaintiff also claims that he asked Defendant to cease its contacts to collect amounts that Plaintiff told Defendant he did not owe. Plaintiff alleges that Defendant continued to make collection calls, that they were made several times a day, including after 9:00 p.m. in the evening, to his wife's workplace, and to his credit references. (Compl. at 2). Liberally construing his entire Complaint, the Court finds that Plaintiff asserts claims for discrimination, breach of contract, theft, harassment, defamation, trespassing, and a violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. ("FDCPA").[8] Plaintiff seeks damages in the amount of $6 million.[9] (Id.).

---

[8] This construction of his Complaint as including a claim under the Fair Debt Collection Practices Act is reinforced by the language in the Complaint that clearly points to asserted violations of the FDCPA. See 15 U.S.C. § 1692c(a)(1) (prohibiting phone calls after 9:00 p.m.). Additionally, in Plaintiff's deposition, he claims that in response to the phone calls "[e]ven one time I reminded them that there was a thousand dollar charge per call . . . ." See id. § 1692k(a)(2) (allowing for statutory damages of $1,000 per violation); (Dep. of Pl. 83:21-24). The Court finds these allegations put Defendant on notice of a FDCPA claim and satisfy the liberal pleading standards under the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 8(a); Sams v. United Food & Commercial Workers Int'l Union, 866 F.2d 1380, 1384 (11th Cir. 1989) ("A complaint need not specify in detail the precise

On July 30, 2010, Defendant removed the action to this Court and filed its Answer and Counterclaims. In its Counterclaims, Defendant alleges a breach by Plaintiff of his obligation to pay amounts due under the Contract and default on the loan. (Def.'s Answer and Countercls. at 10-13). Defendant seeks recovery of attorney's fees pursuant to O.C.G.A. § 13-6-11.[10] (Id. at 13). Defendant claims that Plaintiff's refusal to pay amounts due under the loan constitutes a default and breach of the loan and Contract. (DSUMF ¶¶ 22-23; Def.'s Answer and Countercls. at 11-12).

On April 8, and April 29, 2011, Defendant and Plaintiff moved and cross-moved, respectively, for summary judgment on Plaintiff's claims and Defendant's Counterclaims.

## II. DISCUSSION

### A. Summary judgment standard

Upon motion by a party, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

---

theory giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests.").

[9] Plaintiff based his asserted damages on what he has seen "on mass media, like newspapers." (DSUMF ¶ 32).

[10] The Court notes that Defendant is not seeking recovery of attorney's fees in collecting on a note pursuant to O.C.G.A. § 13-1-11.

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Parties "asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).

The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999). Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999). Non-moving parties "need not present evidence in a form necessary for admission at trial; however, [they] may not merely rest on [their] pleadings." Id. "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

The Court must view all evidence in the light most favorable to the party opposing the motion and must draw all inferences in favor of the non-movant, but only "'*to the extent supportable by the record*.'" Garczynski v. Bradshaw, 573

F.3d 1158, 1165 (11th Cir. 2009) (quoting Scott v. Harris, 550 U.S. 372, 381 n.8 (2007) (emphasis in original)). "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at 1282. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246. But, this requirement "extends only to 'genuine' disputes over material facts," meaning "more than 'some metaphysical doubt as to the material facts.'" Garczynski, 573 F.3d at 1165 (quoting Scott, 550 U.S. at 380). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

B.     Discrimination

The Court liberally construes Plaintiff's *pro se* discrimination claim, based on his accent and national origin, as an alleged violation of 42 U.S.C. § 1983.[11]

Section 1983 provides "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights,

---

[11] Plaintiff presumably relies on the Equal Protection Clause of the Fourteenth Amendment.

privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983. While not a source of substantive rights, Section 1983 provides a method for vindicating federal rights conferred by the Constitution and federal statutes. Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979).

To prevail in an action under Section 1983, a plaintiff must make a *prima facie* showing of two elements: (1) that the act or omission deprived plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States, and (2) that the act or omission was done by a person acting under color of law. Marshall County Bd. of Educ. v. Marshall County Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993); Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir. 1992) ("A successful section 1983 action requires a showing that the conduct complained of (1) was committed by a person acting under color of state law and (2) deprived the complainant of rights, privileges, or immunities secured by the Constitution or laws of the United States.").

"Only in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes." Harvey, 949 F.2d at 1130. The Eleventh Circuit uses three tests to determine whether the actions of a private party should be attributed to the state: (1) the public function test, which "limits state action to instances

where private actors are performing functions traditionally the exclusive prerogative of the state;" (2) the state compulsion test, which "limits state action to instances where the government has coerced or at least significantly encouraged" the challenged action; and (3) the nexus/joint action test, which applies when "the state has so far insinuated itself into a position of interdependence with the [private party] that it [i]s a joint participant in the enterprise." See Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1277 (11th Cir. 2003) (citations and internal quotations omitted).

Defendant is a private corporation that does not perform any traditional state functions, has not been coerced or encouraged by the state to make automobile loans, and has not jointly participated in an enterprise with the state. Defendant is not a state actor and there is no dispute that Plaintiff does not have a claim of discrimination against Defendant. Summary judgment is granted for Defendant on Plaintiff's discrimination claim.

C.      Breach of contract

In Georgia, to have "a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." O.C.G.A. § 13-3-1. An action for breach of contract requires breach of a valid contract and

resultant damages to the party who has the right to complain about the breach.

Budget Rent-A-Car of Atlanta, Inc. v. Webb, 469 S.E.2d 712, 713 (Ga. Ct. App. 1996); see also TDS Healthcare Sys. Corp. v. Humana Hosp. Illinois, Inc., 880 F. Supp. 1572, 1583 (N.D. Ga. 1995) ("The essential elements of a breach of contract claim are (1) a valid contract; (2) material breach of its terms; and (3) damages arising therefrom.").[12]

Each party in this action claims the other party breached the Contract. (Compl. at 1; Def.'s Answer and Countercls. at 10-13).

### 1.    *Plaintiff's breach of contract claim*

Plaintiff claims that Defendant breached the Contract by "force placing" insurance on the Vehicle.  (Pl.'s Mot. for Summary J. at 13-14; Pl.'s Reply Mem.

---

[12] Plaintiff claims damages to his credit as a result of the breach of contract that prevented him from being able to obtain a home loan from Wells Fargo.  (Pl.'s Dep. 86:21-88:17).  Defendant claims that it is undisputed that Plaintiff has not sustained any damages and is entitled to summary judgment.  (Def.'s Mot. for Summary J. at 13).  In Georgia, a party bringing an action for breach of contract need not prove any actual damages and may recover nominal damages sufficient to cover the costs of bringing the action.  See O.C.G.A. § 13-6-6 ("In every case of breach of contract the injured party has a right to damages, but if there has been no actual damage, the injured party may recover nominal damages sufficient to cover the costs of bringing the action.");  Duke Galish, LLC v. Manton, 707 S.E.2d 555, 560 (Ga. Ct. App. 2011).  Because Plaintiff is entitled to recover nominal damages, the Court finds that Defendant's claim that he suffered no actual damages is not sufficient to defeat Plaintiff's claim and entitle it to summary judgment.  The Court further finds that there is a dispute of fact regarding whether Plaintiff has suffered actual damages as a result of being denied a loan by Wells Fargo.  This issue will be addressed, if necessary, at trial.

in Supp. of Pl.'s Mot. for Summary J. at 21). In support of his litigating position,

Plaintiff claims that the force placing of insurance was a breach of the Contract

because he complied with all of the provisions of the Contract, including by

obtaining and maintaining proper insurance on the Vehicle, that he provided

Defendant with proof of insurance, and that he otherwise made his required

payments under the loan. (Aff. of Stefan Goia ¶ 10). Plaintiff cites to his

deposition testimony, affidavit, and the documentary evidence — including a copy

of the Nationwide policy and the GAP policy listed on the Contract — to show that

he not only had valid insurance, but also provided notice of that insurance to

Defendant, and made his required payments. (Aff. of Stefan Goia at 29-30; Aff. of

Renee Woods ¶ 12).

In opposition, Defendant claims Plaintiff's insurance lapsed, it demanded

proof of insurance pursuant to the Contract, Plaintiff failed to provide it, and that,

in any event, the insurance that was obtained by Plaintiff from Nationwide on June

5, 2007, was not sufficient to satisfy the contractual requirement that physical

damage insurance be of an amount that would cover Defendant's interest in the

Vehicle. Defendant also claims that Plaintiff's failure to pay the amount Plaintiff

owed under the loan amounted to a default entitling Defendant to seek the total

amount due on the loan. Defendant thus claims it was entitled to declare Plaintiff

in default on the entire loan for non-payment, to "force place" insurance on the collateral Vehicle securing the loan, to require Plaintiff to pay the premium, and declare him to be in default when he refused to pay amounts due under the terms of the loan. In support of its litigating position, Defendant cites to Plaintiff's deposition testimony, an affidavit from one of its employees, and its Statement of Undisputed Material Facts, which are deemed admitted by Plaintiff.

The Court finds that there are disputed factual issues regarding whether Plaintiff met the insurance requirements of the Contract, including whether insurance was in force when the CPI Policy was purchased and its premium billed to Plaintiff, and whether Plaintiff actually told Defendant that he had such insurance in response to the insurance request. Summary judgment on Plaintiff's breach of contract claim is inappropriate.

### 2. *Defendant's breach of contract counterclaim*

Defendant counterclaims that Plaintiff defaulted on the note and breached the Contract by failing to pay the amounts due under the loan, by not properly maintaining adequate physical damage insurance, and by refusing to pay for the

premium on the force-placed CPI Policy. (Def.'s Mot. for Summary J. at 11-13, 24-25; Def.'s Answer and Countercls. at 10-13).[13]

In support of its litigating position, Defendant claims that Plaintiff breached his payment obligation under the Contract, that Plaintiff defaulted on the loan by failing to pay the amounts due, and that it was entitled to force place insurance on the Vehicle. (Def.'s Answer and Countercls. at 10-13). As with his breach of contract claim, Plaintiff claims that he did not breach the agreement because he had adequate insurance, made payments on the loan until the account was "closed," and otherwise complied with all the Contract's terms. Plaintiff admits that he ceased making payments on the loan prior to its expiration when Defendant

---

[13] Defendant also seems to claim that the Contract was breached when Plaintiff failed to name Defendant — as opposed to Star Suzuki — as the lienholder under any insurance policy that was in force. The Contract required Plaintiff to have insurance covering "our interest in the vehicle." (DSUMF ¶¶ 16, 18, 25; Ex. B to Aff. of Stefan Goia). At the moment the Contract was signed, the most that can be assumed is that Plaintiff knew Star Suzuki was the seller-creditor who would be the beneficiary of any insurance proceeds and who held a security interest in the Vehicle as noted on the Contract. It is not known when the assignment of Star Suzuki's interest in the Contract to CitiFinancial was executed, whether Plaintiff was told that an assignment had been made, or whether Plaintiff was otherwise aware of CitiFinancial's relationship to the transaction. These are issues to be addressed at trial.

allegedly closed his account.  (Aff. of Stefan Goia at 8-9, 19-20; Annex 2 to Pl.'s

Mot. to Remove Clerk's Entry of Default).[14]

Because Plaintiff and Defendant dispute whether Plaintiff complied with the

terms of the Contract; because it is unclear whether Defendant closed Plaintiff's

account and, if so, what "closed" means; and because Plaintiff claims he did not

fail to make his payments, there are disputes of fact regarding how and when the

Contract was breached.  Summary judgment is inappropriate on Defendant's

counterclaim.

D.    Defamation

To state a claim for defamation under Georgia law, a plaintiff must show:

(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged

communication to a third party; (3) fault by the defendant amounting at least to

negligence; and (4) special harm or the "actionability of the statement irrespective

of special harm."  Mathis v. Cannon, 573 S.E.2d 376, 380 (Ga. 2002).  Special

harm sufficient to support a defamation claim can only arise from allegations "(1)

Imputing to another a crime punishable by law; (2) Charging a person with having

some contagious disorder or with being guilty of some debasing act which may

_____

[14] If the account was not closed, Defendant likely has a meritorious claim against
Plaintiff for at least the outstanding amount of principal due at the time Plaintiff
ceased paying on the loan.  This is an issue to be addressed at trial.

exclude him from society; (3) Making charges against another in reference to his trade, office, or profession, calculated to injure him therein; or (4) Uttering any disparaging words productive of special damage which flows naturally therefrom." O.C.G.A. § 51-5-4.

A state law defamation claim based on information conveyed in collecting on a debt also is preempted by the Fair Credit Reporting Act ("FCRA"). Section 1681h(e) of the FCRA provides that state common law actions, such as defamation, are preempted by federal law, "except as to false information furnished with malice or willful intent to injure such consumer." 15 U.S.C. § 1681h(e). Section 1681h(e) thus permits Plaintiff to bring suit for defamation only if Defendant acted with malice or willful intent to injure Plaintiff.

There is no evidence to support a defamation claim and the little evidence Plaintiff suggests exists could not allow a rational trier of fact to find that Defendant made a false or defamatory statement, made a statement sufficient to support a defamation claim, or that Defendant acted with malice or with willful intent to injure Plaintiff in collecting on its debt. Summary judgment is granted for Defendant on Plaintiff's defamation claim.

E.    Theft, harassment, and criminal trespass

The criminal statutes upon which Plaintiff purports to bring claims for theft, harassment, and trespassing do not provide for a civil remedy and a civil remedy cannot be implied to arise from a violation of a criminal statute in Georgia.  See O.C.G.A. §§ 16-5-90, 16-7-21, 16-8-2, 16-8-3, 16-11-39.1; Anthony v. Am. Gen. Fin. Servs., Inc., 697 S.E.2d 166, 171-72 (Ga. 2010).  Summary judgment is required to be granted for Defendant on Plaintiff's claims based on criminal theft, harassment, and trespass.

F.    Tort of trespass

"The right of enjoyment of private property being an absolute right of every citizen, every act of another which unlawfully interferes with such enjoyment is a tort for which an action shall lie."  O.C.G.A. § 51-9-1.  "Under Georgia law, 'a trespasser is one who, though peacefully or by mistake, wrongfully enters upon property owned or occupied by another.'"  Lee v. S. Telecom Co., 694 S.E.2d 125, 128 (Ga. Ct. App. 2010) (quoting Frank Mayes & Assoc. v. Massood, 518 S.E.2d 903, 905 (Ga. Ct. App. 1999)); see also Pope v. Pulte Home Corp., 539 S.E.2d 842, 843-44 (Ga. Ct. App. 2000) ("A person commits trespass when he knowingly and without authority enters upon the land of another after having received prior notice that such entry is forbidden.").

Here, Plaintiff does not identify any evidence that there was an unlawful interference with Plaintiff's right to enjoy his property and to the extent he claimed at one time that visits to his home by Defendant or its agents constituted a trespass, Plaintiff has now acknowledged under oath at his deposition that the visits were polite and appropriate. To the extent that Plaintiff is alleging a tortious act of trespass, no rational trier of fact would find that Defendant or any of its representatives interfered with Plaintiff's right to enjoy his property or wrongfully entered upon his property. See O.C.G.A. § 51-9-1; Pope, 539 S.E.2d at 843. Summary judgment is granted for Defendant on this claim.

G.      Harassment and the Fair Debt Collection Practices Act

At his deposition, Plaintiff stated that he considered the collection calls from CitiFinancial to constitute harassment. (Dep. of Pl. 24-26). Plaintiff claims that he asked Defendant to cease calling him and to stop sending him correspondence regarding the debt. Plaintiff also testified at his deposition: "I even told them that if they don't stop this harassment, I will sue them for harassment; and they answered in bad faith that I will call you until you pay. . . . Instead to stop even after I told them that I will sue them, they start to call more often, starting to give

two, three calls a day and they even reach seven phone calls a day."[15] (Id.)

Plaintiff claims that after asking Defendant to stop making the calls, calls were made to his home after 9:00 p.m. and that calls were made to his wife's place of employment. (Aff. of Stefan Goia ¶ 21). Plaintiff has alleged harm as a result of these allegedly harassing phone calls in the form of stress resulting in him being "heart sick." (Id.). Defendant admits that it placed collection calls to Plaintiff in an effort to resolve issues with the loan. (Aff. of Woods ¶¶ 21, 23).

Contrary to Defendant's claim that there is no civil action for harassing phone calls, certain telephone communications to a debtor by a debt collector after he has challenged the debt can give rise to a cause of action under the FDCPA. (Def.'s Mot. for Summary J. at 21).

The FDCPA protects consumers from unfair, harassing, or deceptive debt collection practices. Acosta v. Campbell, 309 F. App'x 315, 320 (11th Cir. 2009). Under Sections 1692e and 1692f, a debt collector may not use misleading, deceptive, false or unconscionable means to collect a debt. 15 U.S.C.§§ 1692e, 1692f. A violation of the FDCPA can arise where a debt collector, in attempting to collect a debt, calls after 9:00 p.m.; fails to make meaningful disclosure of its

---

[15] Plaintiff claims to have detailed phone bills from AT&T documenting these phone calls, but has not produced or attached them to any of his pleadings. (Dep. of Pl. 26:2-7).

identity in communications to collect a debt; uses false, deceptive, or misleading

representations or means in connection with collection of a debt; fails to disclose in

subsequent communications that the communication is from a debt collector;

falsely represents the character, amount, or legal status of the debt; or threatens to

take an action that cannot legally be taken or is not intended to be taken.  See 15

U.S.C. §§ 1692c, 1692d(6), 1692e; Kuria v. Palisades Acquisition XVI, LLC, 752

F.Supp.2d 1293, 1300 n.6 (N.D. Ga. 2010); see also 1st Nationwide Collection

Agency, Inc. v. Werner, 654 S.E.2d 428, 430-31 (Ga. 2007).  A violation of

Section 809(b) of the FDCPA may also arise where a debt collector continues to

call after a consumer challenges the validity of the debt.[16]  15 U.S.C. § 1692g(b).

However, the FDCPA, by its terms, only applies to "debt collectors" and

defines them as those who regularly enforce the debts of another or whose

---

[16] Section 809(b) of the FDCPA provides:

> If the consumer notifies the debt collector in writing within the
> thirty-day period described in subsection (a) of this section that the
> debt, or any portion thereof, is disputed, or that the consumer
> requests the name and address of the original creditor, the debt
> collector shall cease collection of the debt, or any disputed portion
> thereof, until the debt collector obtains verification of the debt or a
> copy of a judgment, or the name and address of the original
> creditor, and a copy of such verification or judgment, or name and
> address of the original creditor, is mailed to the consumer by the
> debt collector.

15 U.S.C. § 1692g(b).

principal business purpose is the enforcement of security interests. 15 U.S.C.

§ 1692a(6).  A creditor collecting its own debts in its own name is not subject to

liability under the FDCPA.  See id. § 1692a(6); Montgomery v. Huntington Bank,

346 F.3d 693, 699 (6th Cir. 2003) ("[T]he federal courts are in agreement: A bank

that is a creditor is not a debt collector for the purposes of the FDCPA and

creditors are not subject to the FDCPA when collecting their accounts.") (internal

quotation marks omitted); Aubert v. Am. Gen. Fin., Inc., 137 F.3d 976, 978 (7th

Cir. 1998) ("Creditors who collect in their own name and whose principal business

is not debt collection, therefore, are not subject to the [FDCPA]."); Humphrey v.

Wash. Mut. Bank, F.A., No. 1:06-CV-1367-JOF, 2007 U.S. Dist. LEXIS 40279, at

*4 (N.D. Ga. June 1, 2007) (FDCPA "applies only to debt collectors and not to

creditors or mortgage servicers"); see also Nwoke v. Countrywide Home Loans,

Inc., 251 F. App'x 363, 364-65 (7th Cir. 2007); Perry v. Stewart Title Co., 756

F.2d 1197, 1208 (5th Cir. 1985), modified on other grounds, 761 F.2d 237 (5th Cir.

1985); Winstead v. EMC Mortg. Corp., 697 F. Supp. 2d 1, 4 (D.D.C. 2010); Burns

v. Bank of America, 655 F. Supp. 2d 240, 254-55 (S.D.N.Y. 2008), aff'd 360 F.

App'x 255 (2d Cir. 2010); Diessner v. Mortg. Elec. Registration Sys., 618 F. Supp.

2d 1184, 1187-89 (D. Ariz. 2009), aff'd 384 F. App'x 609 (9th Cir. 2010); Somin

v. Total Cmty. Mgmt. Corp., 494 F. Supp. 2d 153, 160 (E.D.N.Y. 2007).

Here, it is undisputed that the phone calls came from Defendant and that Defendant was seeking to collect a debt owed to it from Plaintiff. Liberally construing Plaintiff's claim of harassment as a claim under the FDCPA, the Court necessarily finds that summary judgment must be granted for Defendant because the FDCPA does not apply to actions by a creditor in collecting its own debt.

H.    Defendant's claim for attorney's fees

Defendant correctly states that the Contract provides that if it has to hire an attorney to collect an amount due under the note, Plaintiff may be liable for up to 15% of the amount owed. (Def.'s Mot. for Summary J. at 24). This presumes that Defendant is seeking to recover attorney's fees in collecting on the note pursuant to O.C.G.A. § 13-1-11. In the Counterclaim, however, Defendant seeks attorney's fees pursuant to O.C.G.A. § 13-6-11, not § 13-1-11. Under O.C.G.A. § 13-6-11, the expenses of litigation are deemed to be actual damages caused by a party who has acted in bad faith, has been stubbornly litigious, or has caused the other party unnecessary trouble and expense. See O.C.G.A. § 13-6-11; Davis v. Whitford Props., Inc., 637 S.E.2d 849, 854 (Ga. Ct. App. 2006) (award of attorney's fees pursuant to O.C.G.A. § 13-6-11 is not a consequential damage award, but is considered an award of actual damages); Dep't of Transp. v. Arapaho Const., Inc., 349 S.E.2d 196, 200 (Ga. Ct. App. 1986). Whether a party has exhibited bad faith,

has been stubbornly litigious, or has caused the other party unnecessary trouble and expense is an issue for a trier of fact to determine.[17] See Harris v. Tutt, 702 S.E.2d 707, 710 (Ga. Ct. App. 2010) (bad faith is an issue for the jury to determine). Summary judgment is not appropriate on this claim.

## III.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [37] is **GRANTED IN PART** for Defendant on Plaintiff's claims of discrimination, theft, harassment, trespass, defamation, and violation of the FDCPA and **DENIED IN PART** on Plaintiff's claim and Defendant's counterclaim for breach of contract, and Defendant's claim for attorney's fees.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment [43] is **DENIED**.

---

[17] The Court notes that even if Defendant were seeking attorney's fees pursuant to O.C.G.A. § 13-1-11, there is no proof in the record that the statutory notice prerequisites have been complied with to allow for recovery of attorney's fees. Georgia law requires a party seeking attorney's fees in collecting on a note to issue a demand notice, which must: (1) be in writing; (2) be addressed to the party sought to be held on the obligation; (3) be served after maturity of the note; (4) state that the provisions relative to payment of attorney fees in addition to principal and interest will be enforced; and, (5) state that the party has ten (10) days from the receipt of such notice to pay the principal and interest without the attorney fees. O.C.G.A. § 13-1-11; Sec. Pac. Bus. Fin., Inc. v. Lichirie Ventures-Godby Plaza, Ltd., 703 F. Supp. 936, 939 (N.D. Ga. 1989); Textile Rubber and Chem. Co., Inc. v. Thermo-Flex Techs., Inc., 706 S.E.2d 728, 733-34 (Ga. App. 2011).

**SO ORDERED** this 13th day of January, 2012.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE